## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DANIEL N. MBULU a/k/a
DAN N. GODFREY,

      Plaintiff, *pro se*,

      v.

BUREAU OF NATIONAL AFFAIRS,
INC.,

      Defendant.

Civil Action No. 04-1540 (JDB)

## MEMORANDUM OPINION

After working for two and a half years without obtaining a promotion, plaintiff Daniel N.

Mbulu quit his job as a legal editor and commenced this *pro se* action against his employer, the

Bureau of National Affairs, Inc. ("BNA" or "defendant"), alleging that he was subjected to racially

discriminatory employment practices, in violation of Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and the District of Columbia Human Rights

Act, D.C. Code § 2-1401.01 et seq. ("DCHRA").  Following the completion of discovery, the

parties filed motions for summary judgment along with supporting memoranda and exhibits.

Upon consideration of the cross-motions and the entire record herein, and for the reasons that

follow, the Court concludes that there are no material factual disputes, that all questions of law are

ripe for judicial resolution, and that plaintiff either is unable to show that BNA's actions caused

him any legally relevant detriment or has failed to produce evidence that would support a

determination that race was a factor in the challenged conduct or that otherwise would rebut

BNA's race-neutral explanations for its actions.  Accordingly, the Court will grant defendant's

motion for summary judgment and order judgment for defendant as a matter of law.

## BACKGROUND[1]

BNA, a private publisher of law-related newsletters, information services, and reference

products, employed plaintiff, an African-American, as a "Tax Law Editor I" in the U.S. Income

Group of BNA's Tax Management division from June 18, 2001, through November 27, 2003,

when plaintiff tendered his resignation.  Pl.'s Stmt. at 1-3; Def.'s Stmt. at 1-3.  Plaintiff, who holds

a juris doctor degree from American University's Washington College of Law and is a Certified

Public Accountant ("C.P.A."), previously had worked for BNA on a temporary full-time basis

during a summer break from law school in 1999.  Pl.'s Stmt. at 1; Pl.'s Ex. J (plaintiff's résumé).

At the time of plaintiff's hiring in 2001, BNA set his compensation at the third step of the Grade 8

or "G8" pay range, which amounted to a weekly salary of $908.62.  Def.'s Stmt. at 2; Def.'s Opp'n

Ex. 5 (2002 Length-of-Service Review); Pl.'s Stmt. at 2.[2]  His immediate supervisor was, at all

---

[1] The facts summarized in this section are not in dispute.  For ease of reference, the Court will use the following citation forms for the parties' briefs on their cross-motions for summary judgment: Defendant's Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem."); Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Mem."); Defendant's Opposition to Plaintiff's Motion for Summary Judgment ("Def.'s Opp'n"); Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n"); and Defendant's Reply to Plaintiff's Opposition to Motion for Summary Judgment ("Def.'s Reply"). Pursuant to L. Civ. R. 56.1, each party also submitted a Statement of Material Facts As To Which There Is No Genuine Issue, which the Court will cite herein as "Pl.'s Stmt." and "Def.'s Stmt." Unless otherwise noted, the parties' exhibits were filed with their respective motions for summary judgment.

[2] Plaintiff asserts that his annualized starting salary was $46,350, which would amount to a weekly pay rate of $891.35, rather than $908.62.  This $17 discrepancy, however, is of no importance for present purposes.

times, Eric Rubin, a Caucasian who held the position of assistant managing editor for Tax

Management.  Pl.'s Stmt. at 2-3.  Mr. Rubin supervised both the U.S. Income Group, which had

six tax law editors (including plaintiff), and the Procedure Group, which had three tax law editors.

Of the nine tax law editors under Mr. Rubin's supervision, two were African-American (plaintiff

and Andre Mander).  Pl.'s Stmt. at 2-3; Def.'s Stmt. at 2-3.

Plaintiff received two annual reviews during his time at BNA, both of which generally

rated his performance as "satisfactory" (he received one rating of "above average" for

"cooperation" in his 2003 review).  Pl.'s Ex. H; Def.'s Opp'n Exs. 15 & 17.  The memoranda from

Mr. Rubin to plaintiff that accompanied the reviews contained mostly favorable comments, with a

few suggestions for areas of improvement.  Pl.'s Ex. H; Def.'s Opp'n Exs. 16 & 18.  At the time of

his resignation, plaintiff had received only non-merit pay increases -- which, according to

plaintiff's own documentation amounted to an increase of $87.37 per week (about $4,543 in

annualized pay) or nearly ten percent over the course of his two-plus years of employment with

BNA[3] -- and his title and pay grade remained the same as when he started: Tax Law Editor I at a

G8 level.  Def.'s Stmt. at 5; Def.'s Opp'n Exs. 15 & 17.  Defendant does not dispute that plaintiff

expressed to his superiors an interest in obtaining a promotion to the position of Tax Law Editor

II, which qualified for the higher G9 pay grade, or that defendant implicitly rejected that request

for promotion as part of plaintiff's annual performance reviews.  The parties further agree that a

BNA employee who holds the title of Tax Law Editor I performs the same work, in all material

---

[3] Plaintiff's pay stub dated December 4, 2003, indicated that his pay rate was "$995.99 weekly," see Pl.'s Ex. L, up from the $908.62 "current base rate" figure reflected in his Length-of-Service Review from 2002, see Def.'s Opp'n Ex. 15.  Plaintiff's 2003 Annual Performance Evaluation, dated June 17, 2003, indicated that his "current weekly salary" at that time was $964.64.  See Def.'s Opp'n Ex. 17.

respects, as an employee who holds the title of Tax Law Editor II or III, notwithstanding the variances in pay.

The parties also do not dispute that Mr. Rubin had frequent daily interactions with plaintiff regarding his work or that the two men had some conversations about workplace behaviors such as plaintiff's personal use of telecommunications and computer equipment for sending or receiving facsimiles and e-mail -- although the parties, naturally, characterize the relevant events in different terms (what plaintiff labels "harassment" and "surreptitious surveillance," Pl.'s Stmt. at 4-5, defendant describes as "aggressively uph[olding] BNA's policies," Def.'s Stmt. at 11). Nor do the parties disagree about the fact that Mr. Rubin required plaintiff to submit doctor's notes to validate two sick-leave absences in October 2003.

On September 3, 2004 -- approximately nine months after plaintiff resigned -- plaintiff initiated this *pro se* action, which alleges that BNA committed unlawful discrimination on the basis of race by failing to promote plaintiff and through other actions related to the supervision of plaintiff; he also alleges that BNA created a racially hostile work environment, in contravention of federal and D.C. anti-discrimination statutes. Both parties contend that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion

by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Fed. R. Civ. P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. Celotex, 477 U.S. at 322. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

Although the parties have filed cross-motions for summary judgment, that "does not automatically relieve the court from determining if a genuine issue of material fact exists." Cartwright v. Dist. of Columbia, 267 F.Supp. 2d 83, 85 (D.D.C. 2003) (citing Krug v. Santa Fe Pac. R.R. Co., 158 F.2d 317 (D.C. Cir. 1946)). "The rule governing cross-motions for summary judgment ... is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." Sherwood v. Washington Post, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) (quoting McKenzie v. Sawyer, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982)).

**ANALYSIS**

Plaintiff has packaged the alleged incidents of racially discriminatory treatment into four separate counts that essentially raise two distinct Title VII or DCHRA causes of action: disparate treatment and hostile work environment.[4]  The Court will address each cause of action, in turn.

**I.      Disparate Treatment Based on Race**

**A.      Legal Framework**

Under Title VII, it is "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a) (2005).  Where, as here, there is no *direct* evidence of unlawful discrimination, federal courts apply the burden-shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny.

Pursuant to McDonnell Douglas, the plaintiff, as an initial matter, has the burden of establishing a prima facie case of discrimination by a preponderance of the evidence.  Id. at 802; Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  To establish a prima facie case of discrimination, a plaintiff must demonstrate that (1) he is a member of a protected class; (2) he suffered an adverse employment action;[5] and (3) the unfavorable action gives rise to an

---

[4] Because claims under the DCHRA are analyzed under the same framework as Title VII claims, all discussion herein of plaintiff's Title VII claims applies with equal force to his DCHRA claims.  See Regan v. Grill Concepts-D.C., Inc., 338 F.Supp. 2d 131, 134 (D.D.C. 2004). Furthermore, in light of the substantive overlap between the two statutes and to avoid redundancy, the Court will treat all the claims as arising under Title VII for purposes of resolving this motion, recognizing that the outcome would be the same under either statute.

[5] To establish an adverse employment action, plaintiff must show an action that results in "objectively tangible harm."  Brown v. Brody, 199 F.3d 446, 457 (D.C. Cir. 1999).

inference of discrimination.  Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002); Brody, 199

F.3d at 452.

Once the plaintiff establishes a prima facie case, the burden then shifts to the employer to

articulate a legitimate, nondiscriminatory reason for its actions.  McDonnell Douglas, 411 U.S. at

802.  The employer's burden, however, is merely one of production.  Burdine, 450 U.S. at 254-55.

The employer "need not persuade the court that it was actually motivated by the proffered reasons.

It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it

discriminated against the plaintiff."  Id.

If the employer produces sufficient evidence of a nondiscriminatory justification, the

burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for

discrimination or retaliation.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143

(2000).  The plaintiff "may attempt to establish that he was the victim of intentional

discrimination 'by showing that the employer's proffered explanation is unworthy of credence.'"

Id. (quoting Burdine, 450 U.S. at 256).  But "[p]roof that the defendant's explanation is unworthy

of credence is simply one form of circumstantial evidence that is probative of intentional

discrimination."  Id. at 147.  Thus, the trier of fact may also "consider the evidence establishing

the plaintiff's prima facie case 'and inferences properly drawn therefrom ... on the issue of whether

the defendant's explanation is pretextual.'"  Id.  (quoting Burdine, 450 U.S. at 255 n.10).

"Whether judgment as a matter of law is appropriate in any particular case will depend on

a number of factors ... includ[ing] the strength of the plaintiff's prima facie case, the probative

value of the proof that the employer's explanation is false, and any other evidence that supports

the employer's case and that properly may be considered on a motion for judgment as a matter of

law." Id. at 148-49.  As the D.C. Circuit has explained:

> Assuming then that the employer has met its burden of producing a
> nondiscriminatory reason for its actions, the focus of proceedings at trial (and at
> summary judgment) will be on whether the jury could infer discrimination from the
> combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff
> presents to attack the employer's proffered explanation for its actions; and (3) any
> further evidence of discrimination that may be available to the plaintiff (such as
> independent evidence of discriminatory statements or attitudes on the part of the
> employer) or any contrary evidence that may be available to the employer (such as
> evidence of a strong track record in equal opportunity employment).

Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc); see also

Waterhouse v. District of Columbia, 298 F.3d 989, 992-993 (D.C. Cir. 2002).

Although the "intermediate evidentiary burdens shift back and forth" under the

McDonnell-Douglas framework, "'[t]he ultimate burden of persuading the trier of fact that the

defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"

Reeves, 530 U.S. at 143 (quoting Burdine, 450 U.S. at 253).  Once the defendant has proffered a

legitimate non-discriminatory reason for its action, then the question is whether that proffered

reason is a pretext for discrimination, and at this point the McDonnell Douglas burden-shifting

framework disappears; the sole remaining issue is discrimination *vel non*, and "to survive

summary judgment the plaintiff must show that a reasonable jury could conclude from all of the

evidence that the adverse employment decision was made for a discriminatory reason."  Lathram

v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003); see Reeves, 530 U.S. at 142-43.

**B.     Discussion**

There is no doubt that plaintiff is a member of a protected class (African-American), and

so, for purposes of determining whether plaintiff has made out a prima facie case of disparate

treatment based on race, the only questions the Court must resolve are whether, viewing the

evidence in the light most favorable to plaintiff, any of defendant's actions toward plaintiff

constitute an "adverse employment action," and, if so, whether the adverse action occurred under

circumstances that would give rise to an inference of racial discrimination.  Having examined the

factual record surrounding each of plaintiff's claims, the Court concludes that there are no material

facts in dispute with respect to these issues, and that plaintiff either has failed to establish a prima

facie case or has not refuted defendant's proffered nondiscriminatory justification for the

questioned employment action.  Therefore, as a matter of law, plaintiff cannot prevail on his

claims, and judgment will be entered in favor of defendant on all of plaintiff's claims of

discriminatory employment actions.

### 1.    Failure to promote

Plaintiff alleges that he was denied noncompetitive promotions from Tax Editor I (pay-

grade level 8) to Tax Editor II and III (pay-grade levels 9 and 10, respectively).  This claim is

different from an ordinary failure-to-promote claim in that plaintiff did not seek promotion to a

vacant position; instead, plaintiff asserts that he should have been promoted simply by virtue of

the fact that he met the minimum qualifications for the higher-grade positions.[6]  See Taylor v.

---

[6] This claim also is atypical in that the status change that plaintiff was denied was not what
one ordinarily would consider to be a "promotion."  By plaintiff's own admission, someone who
held the title of Tax Editor II or III did have any different duties or responsibilities than someone,
like plaintiff, who held the title of Tax Editor I.  See Am. Compl. ¶ 15 ("All editors in the U.S.
Income Group performed similar assignments, chose tasks from the same pool of tasks, met [the]
same deadlines and submitted to the same standard" regardless of job title or pay grade.); Pl.'s
Stmt. ¶ 12 (same) (citing Pl.'s Ex. D., Dep. of Andre Mander, testimony of Tax Editor that his job
functions remained the same following his elevation from Grade 8 to Grade 9 and from Grade 9 to
Grade 10); Pl.'s Ex. I, Job Descriptions for Tax Editor I, II, and III (listing identical duties for each
position).  Indeed, by all accounts, the only notable difference in the jobs was the associated
salary, which apparently was intended to reflect variations in knowledge, skill, and ability level
among editors who perform the same tasks.  See Pl.'s Ex. I; Pl.'s Ex. B, Dep. of Virginia Shew, at
26-27 ("You cannot quantify the difference between a G8, a G9, and a G10. ... It's solely on the

Small, 350 F.3d 1286, 1294 (D.C. Cir. 2003).

a.      Prima facie case

As explained above, a prerequisite for any disparate-treatment claim under Title VII is an

adverse employment action.  To establish that denial of a promotion constitutes an adverse

employment action (i.e., an  "objectively tangible harm." Brody, 199 F.3d at 457), plaintiff must

show that he sought a promotion for which he was qualified and that he was denied that

promotion.  See Nurriddin v. Goldin, 382 F.Supp. 2d 79, 103 (D.D.C. 2005) ("[F]ailure to be

promoted [to a position to which one is qualified] is a tangible harm.").  Even when there is no

dispute as to whether plaintiff was denied a promotion, as is the case here, it is nonetheless

incumbent upon plaintiff to show that he was qualified for the higher-grade position.  If plaintiff

succeeds in this regard (i.e., he establishes that he suffered an adverse employment action because

he was denied promotion notwithstanding his objective qualifications), he must complete the

prima facie case by demonstrating that the adverse action occurred under circumstances that

would give rise to an inference of unlawful bias.  Here, defendant concedes that plaintiff is a

member of a protected class and was denied a promotion that he sought, and hence, the Court's

analysis of whether plaintiff has made out a prima facie case will focus on the evidence of (1)

plaintiff's qualifications for the promotion and (2) the circumstantial evidence of discriminatory

motive.

*(1)      Plaintiff's qualifications for promotion*

In an effort to establish that he was indeed qualified for promotion, plaintiff provides his

---

quality of your work.").  In light of this, it might be more apt to describe the complained-of
employment action as a failure to award a pay increase rather than a failure to promote.  But since
both parties refer to it as a failure to promote, the Court will, as well.

own assessment of his qualifications and also points to his supervisor's appraisals of his performance as supporting his view.  Put succinctly, plaintiff contends that he was qualified to be a Tax Law Editor II or III because he "met the minimum requirements" for either position, as described by BNA in its internal job listings.  Pl.'s Mem. at 5.[7]

As already noted, the functions and duties of a Tax Law Editor II or III are identical to those of a Tax Law Editor I, but there are some notable variations in the "minimum job qualifications" for each position.  Whereas a Tax Law Editor I must have "demonstrated knowledge of current Federal, state, or foreign country tax law, plus *some specialized knowledge*, depending on assigned subject area," a Tax Law Editor II must possess "an *intermediate* level of specialized knowledge of at least one subject ... or some specialized knowledge of *at least two subject areas*," and a Tax Law Editor III must have "an *advanced* level of specialized knowledge of at least one subject ... or an *intermediate* level of specialized knowledge of *at least two subjects*, or some specialized knowledge of *at least three subjects*."  Pl.'s Ex. I (emphasis added). Similarly, whereas a Tax Law Editor I need only have some "[a]bility to analyze tax material dealing with a variety of topics," a Tax Law Editor II or III must have a "[d]emonstrated ability to analyze tax materials dealing with topics of *varying complexity*."  Id. (emphasis added).  The difference, in other words, between an editor who holds the title of Tax Law Editor I and one who occupies a more advanced Tax Law Editor position is reflected in the degree of mastery of the subject matter that the editor demonstrates.

---

[7] Because none of plaintiff's filings in this case have numbered pages, all citations to specific pages in plaintiff's briefs are based on the page numbers provided by the Court's CM/ECF electronic docket.  So, for example, "Pl.'s Mem. at 5" refers to page five of the ninety-page main document associated with Docket Entry #35, even though it is the third page of the memorandum.

Although plaintiff professes to have attained the level of expertise required for the higher-level positions, conclusory statements to that effect -- particularly where, as here, the statements are largely unsupported by documentary or other evidence corroborating plaintiff's assessment of his own abilities[8] -- are entitled to little weight in the summary-judgment context.  See Schamann v. O'Keefe, 314 F. Supp. 2d 515, 525 (D. Md. 2004) ("[Plaintiff's] own opinions and conclusory allegations alone do not have sufficient 'probative force to reflect a genuine issue of material fact.'") (citation omitted).  That being said, the Court recognizes that a Title VII plaintiff's burden of making out a prima facie case should not be "onerous."  See Teneyck v. Omni Shoreham Hotel, 365 F.3d 1139, 1149 (D.C. Cir. 2004); Burdine, 450 U.S. at 253.  Therefore the Court concludes that, because the qualifications for the noncompetitive promotions at issue here involve purely subjective judgments, plaintiff's minimal showing with respect to his qualifications (specifically the unchallenged facts contained in his résumé as well as the memoranda accompanying his annual performance appraisals) are sufficient to raise a genuine issue of material fact as to whether he was qualified to be a Tax Editor II.  Plaintiff's claim thus will not fail based on the absence of this element of the prima facie case -- although, as subsequent analysis will show, the claim is legally insufficient for other reasons.

*(2)      Circumstances giving rise to an inference of discrimination*

The fact that plaintiff has provided some evidence indicating he was minimally qualified

---

[8] Plaintiff's argument that "[d]efendant provided no reasons, in any of the years under review, for denying [p]laintiff a promotion from Grade 8 to Grade 9," that "[d]efendant presented not even a single [piece of] documentary evidence with regard to any poor performance by [p]laintiff," and that "[d]efendant could not point to any tangible areas of [p]laintiff's work that evinced poor quality" is a misguided attempt to shift onto defendant plaintiff's own evidentiary burden.  See Pl.'s Mem. at 9.  Defendant, in the first instance, has no obligation to prove that plaintiff was *unqualified* for promotion; the burden is on plaintiff to prove that he was qualified.

for the higher-grade position means only that he has met his initial burden of showing that he suffered an adverse employment action.   To make out a prima facie case of discrimination, he still must come forward with some evidence to support a jury finding that race was a factor in defendant's decision to deny him a promotion.   Title VII, after all, does not prohibit all adverse employment actions against members of protected classes; it only prohibits adverse actions in which the employee's protected status played some role in the challenged action.   At step one of the McDonnell Douglas analysis (the prima facie case), plaintiff must produce facts that would support an inference of unlawful discrimination.

Evidence that "other employees of similar qualifications" who fell outside plaintiff's protected class "were indeed promoted at the time the plaintiff's request for promotion was denied," would be sufficient to establish such an inference.   Taylor, 350 F.3d at 1294; see also Holbrook v. Reno, 196 F.3d 255, 261 (D.C. Cir. 1999).   Thus, if plaintiff can show that defendant promoted similarly situated non-African-American co-workers around the same time that defendant did not promote plaintiff, an inference of racial discrimination would arise.   If, however, there is no evidence of more favorable treatment of similarly situated employees outside of plaintiff's protected class, plaintiff still may come forward with other evidence that suffices to make out a circumstantial case supporting an inference of bias.   Cf. Stella, 284 F.3d at 146 ("[A] plaintiff in a discrimination case need not demonstrate that she was replaced by a person outside her protected class in order to carry her burden of establishing a prima facie case under McDonnell Douglas.").[9]

---

[9] This makes sense, of course, because Title VII does not require a plaintiff to prove that protected status was the *only* reason for the adverse employment action, as long as it was *a* determining factor in the disputed decision.   So, for example, if an employer refused to hire a

Plaintiff asserts that the undisputed evidence of defendant's promotion practices demonstrates that he was treated differently than similarly situated employees outside of plaintiff's protected class, so as to create an inference of discrimination based on that class status. Specifically, plaintiff points to the promotion of a Caucasian colleague in the U.S. Income Group, Caroline Louis, whom BNA hired at a G8 level in October 2001 (a few months after plaintiff's hiring) and promoted to a G9 Tax Editor II position in October 2002.  See Pl.'s Mem. at 9-10; see also Def.'s Stmt. at 5 (noting Ms. Louis's specific hiring and promotion dates).

To be similarly situated, plaintiff must establish that his employment situation was similar in all relevant regards to those with whom he seeks comparison.  See Holbrook, 196 F.3d at 261 ("A plaintiff ... must demonstrate that all of the relevant aspects of [his] employment situation were nearly identical to those" of his comparables.); Phillips v. Holladay Prop. Servs., 937 F. Supp. 32, 37 (D.D.C. 1996) ("it is fundamental that to make a comparison of ... plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly-situated in all respects").  In particular, the co-workers "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Phillips, 937 F.Supp. at 37.

Certainly plaintiff and Ms. Louis were similarly situated in several ways, including having

---

woman for a job because he thought she was too "aggressive," and instead he chose to hire a woman who he thought was more meek, that fact alone would not be dispositive of a sex-discrimination claim.  If the rejected woman could show that the employer hired "aggressive" men for the same position, that might be sufficient to create an inference of sex-based bias on the part of the employer, notwithstanding that he filled the vacancy with a woman.

the same job responsibilities and reporting to the same supervisor.[10]  But they are not uniquely

comparable in this regard.  Seven other tax law editors in the U.S. Income Group and the

Procedure Group also shared the same job responsibilities (or, to the extent that the three editors

in the Procedure Group dealt with a slightly different subject matter, they shared nearly identical

job responsibilities) and reported to the same supervisor, Mr. Rubin, during the period that

plaintiff was employed at BNA.  See Def.'s Stmt. at 4-5.  The Court cannot countenance plaintiff's

self-serving attempt to create an inference of racial discrimination by cherry-picking from this

group of "comparables" a single Caucasian co-worker who was rapidly promoted.  Plaintiff has

provided no rationale for so narrowly confining the universe of comparable employees other than

to argue for exclusion of all similarly situated tax law editors other than Ms. Louis based on the

fact that they either were hired "more than one year" before him or that they worked in a distinct

editorial group (i.e., they edited materials related to a different area of tax law), Pl.'s Mem. at 11.

He has offered no reason for the Court to conclude that an editor's hire date or the precise subject

matter of the publications on which an editor works has any bearing on a promotion from Tax

Law Editor I (G8) to Tax Law Editor II (G9), which is noncompetitive (i.e., promotion of one

_____

[10] If, however, one looks at additional characteristics (as plaintiff himself does -- noting
that he is a C.P.A. and Ms. Louis allegedly is not and that he has published two law review
articles while Ms. Louis allegedly has not published any, see Pl.'s Mem. at 9-10), the comparison
between plaintiff and Ms. Louis becomes much weaker.  Specifically, one possibly relevant point
of comparison is history of job performance; upon review of Ms. Louis's annual appraisals -- the
same type of performance evaluation that plaintiff uses to establish his own qualification for
promotion -- it is evident that Ms. Louis substantially outperformed plaintiff, at least in the eyes of
their mutual supervisor.  See Def.'s Stmt. at 5-7.  Nevertheless, the Court concludes that, for
purposes of plaintiff's prima facie case, plaintiff and Ms. Louis were in fact "similarly situated,"
because it would be counterintuitive to find, at this stage of the McDonnell Douglas analysis, that
plaintiff and Ms. Louis were dissimilarly situated based on the subjective evaluations of the very
supervisor plaintiff alleges was motivated by racial bias.

employee has no effect on the prospects for promotion of another employee).

Once all similarly situated employees are included in the comparison, it is apparent that plaintiff cannot show he received disparate treatment vis-à-vis his counterparts.  Indeed, the undisputed evidence is that, of the four Caucasian tax law editors in plaintiff's U.S. Income Group, two (Louis and Pfenninger) were promoted to the G9 position after about one year at the G8 level, one (Fickes) waited more than three years for her promotion to G9, and one (Brewer) was not promoted above G8 in the three-and-a-half years he worked in the group.  See Def.'s Stmt. at 4-5.  Thus, plaintiff -- having not been promoted after his two-year anniversary -- was treated somewhat differently than two of his Caucasian colleagues but also was treated more or less the same as two others.  Moreover, when the three Caucasian members of the Procedure Group are added to the comparison, the pattern remains the same: one (Hadley) was promoted to G9 after his first anniversary, another (Masri) was promoted after three years at the G8 level, and the third (Wells) waited five years to be promoted from G8 to G9 and another four years to be promoted from G9 to G10.  Add to this evidence the undisputed fact that a similarly situated African-American employee in the U.S. Income Group (Mander) was promoted to G9 after a year-and-a-half at the G8 level, see Def.'s Stmt. at 5, and it is clear that plaintiff has failed to establish any inference of racial discrimination based on the promotional patterns for similarly situated employees.

Although the thrust of plaintiff's prima facie case is a comparison with other employees, a prima facie claim of race discrimination based on failure to promote -- as noted above -- need not rest on proof that the employer promoted similarly situated persons who were outside plaintiff's protected class, so long as plaintiff can establish an inference of racial bias through other

evidence.  In this regard, however, plaintiff fares no better.  The record is devoid of even the

slightest indication that defendant, through managers such as Mr. Rubin, used race in any way to

differentiate among employees.  Plaintiff attempts to create an inference of racial bias by alleging

that Mr. Rubin directed "harassment and hostility" toward the only other African-American editor

in the U.S. Income Group, Mr. Mander.  See Pl.'s Mem. at 11.  But the deposition testimony that

plaintiff cites as supporting this charge indicates only that Mr. Mander complained to Mr. Rubin

and to the union shop steward about a lack of promotions within the group, not that Mr. Mander

believed that he or any other employee had been treated differently based on race.  See Pl.'s Ex. D,

Deposition of Andre Mander, at 16-17; Pl.'s Ex. E, Deposition of Gwen Holmes, at 8-13.

Similarly, although plaintiff advances a litany of complaints regarding the manner in which Mr.

Rubin supervised him, there is nothing in the evidence plaintiff presents that would lead a jury to

conclude that Mr. Rubin applied a different set of standards to plaintiff than to other employees,

such that an inference of racial bias might arise.  Quite the contrary, all of the evidence plaintiff

offers actually indicates that Mr. Rubin closely supervised all his employees, whether they were

Caucasian or African-American.  See Pl.'s Ex. D., Deposition of Scott Wells, at 9-10, 20-21

(testimony of a Caucasian tax law editor that Mr. Rubin exhibited a "lack of editorial discretion,"

was "deeply concerned with minutia," tended to "focus on the inconsequential, such as what time

you came back from lunch, whether you are on the phone, whether you received a personal fax,"

and that other Caucasian employees, including Ms. Louis and Ms. Pfenninger, had complained

about Mr. Rubin's "pettiness" and "control issues").  Plaintiff's unsupported contention that Mr.

Rubin "took his indiscretions and actions much further with regards to" plaintiff, Pl.'s Mem. 13,

and that the only plausible explanation is plaintiff's race, amounts to nothing but the barest

conjecture.  Mere suspicions about motive will not suffice to create an inference of discrimination.

Consequently, plaintiff has failed to make out a prima face case of disparate treatment based on

the denial of promotions.

> b.      Defendant's non-discriminatory justification and plaintiff's rebuttal

Even if the Court were to conclude that plaintiff had established a prima facie case of

discrimination based on the failure to promote -- which it does not -- defendant has offered a

legitimate non-discriminatory justification for the failure to promote plaintiff during the relevant

time period.  Specifically, defendant asserts that plaintiff did not meet its criteria for a merit-based

grade increase.  BNA contends -- through the deposition testimony of Mr. Rubin and Mr. Rubin's

superior, Virginia Shew -- that plaintiff's performance evaluations (the validity of which plaintiff

does not directly dispute) effectively precluded him from receiving a noncompetitive promotion to

Tax Law Editor II or III upon his first or second anniversary:

> An employee is not eligible for a promotion or a merit increase by virtue of demonstrating the minimum knowledge, skills, abilities, education, and experience listed in the job descriptions for Tax Law Editor I, II, and III.  Rather, an employee's eligibility for promotion (and merit increase) is primarily based on the quality of the work product that he or she produces in the course of employment.  An employee may possess the minimum qualifications to be considered a candidate for promotion or to receive a merit increase but neither receive a promotion nor a merit increase due to the quality or quantity of his or her work.  In other words, BNA does not promote an employee to the next higher grade solely because that employee is doing an adequate or satisfactory job at his or her current grade.  To the contrary, employees who are promoted are employees who have earned overall ratings of above average or exceptional in the requisite job performance categories.

Def.'s Mem. at 7.  Defendant further produced evidence demonstrating that those employees who

did receive more rapid promotions from the G8 position to the G9 position -- specifically Ms.

Louis and Mr. Hadley -- received at least an "above average" rating (and often an "exceptional"

rating) for every measure of job performance during the annual review that immediately preceded

their respective promotions.  This is in marked contrast to the "satisfactory" ratings that plaintiff received during his reviews.  Thus, defendant has offered a legitimate, non-discriminatory reason for the challenged employment action: plaintiff's work performance fell short of the standards required for a merit-based promotion.

Because defendant has met its burden of production under the McDonnell-Douglas framework, the burden shifts back to plaintiff to produce evidence from which a rational fact-finder could nonetheless infer that defendant intentionally discriminated against him because of his race, such as by showing that defendant's justification for non-promotion was merely a "pretext for discrimination."  See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993).  Plaintiff must establish "that a reasonable jury could conclude from all the evidence that the adverse employment decision was made for a discriminatory reason."  Lathram, 336 F.3d at 1088.  Resolution of that issue may entail consideration of all relevant evidence including the strength of the prima facie case, any direct evidence of discrimination, circumstantial evidence of the falsity of the proffered explanation, and evidence supporting the employer's case.  See Reeves, 530 U.S. at 147-48; Teneyck, 365 F.3d at 1151; Lathram, 333 F.3d at 1089.  One way in which a Title VII plaintiff can attempt to rebut an employer's proffered non-discriminatory justification is to demonstrate that the rationale fails to counter adequately the inference of discrimination that plaintiff established in his prima facie case.  For example, plaintiff might demonstrate that the proffered  non-discriminatory justification only explains why some similarly situated employees outside the protected class received more favorable treatment than plaintiff, but fails to explain all instances of disparate treatment.  See Burdine, 450 U.S. at 256 (rebuttal evidence may include "showing that the employer's proffered explanation is unworthy of credence").

Plaintiff makes a feeble effort to challenge defendant's race-neutral explanation for the promotion decision, primarily by parsing the language used by Mr. Rubin in the memoranda that accompanied plaintiff's 2002 evaluation and Ms. Louis's 2002 evaluation.  See Pl.'s Opp. at 11-17. Although plaintiff points out some similarities in the phrasing, there are, without question, numerous differences in the two narrative documents -- differences that are entirely consistent with the variation between plaintiff's performance ratings and those of Ms. Louis.  Indeed, plaintiff highlights many of these differences in his opposition brief, but proceeds to discount their significance in light of his personal evaluation of Ms. Louis's work (an evaluation for which he asserts no basis in personal knowledge) as compared with his evaluation of his own work.  See id. This attempt at rebuttal, however, is patently deficient, as it in no way tends to show that plaintiff and Ms. Louis had such similar qualifications that a jury might thereby find BNA's rationale for their different treatment to be incredible.  And, in any event, plaintiff also fails to refute defendant's evidence demonstrating that many Caucasian tax law editors similarly were denied promotions after one or two years at the G8 level.

Thus, beyond plaintiff's failure to carry his prima facie case burden, he also has not shown that the proffered non-discriminatory reason for the denial of his promotion is a pretext for discrimination.  There simply are no facts in dispute that would undermine defendant's race-neutral justification for plaintiff's non-promotion.  See Broderick v. Donaldson, 338 F. Supp. 2d 30, 45 (D.D.C. 2004) (plaintiff's unsubstantiated allegations of racism regarding the reason for a letter of reprimand were insufficient to establish that the letter was pretextual).

c.      Conclusion

Considering "the strength of the plaintiff's prima facie case, the probative value of the

proof that the employer's explanation is false, [as well as the] evidence that supports the employer's case," the Court concludes that there is insufficient evidence for a jury to conclude that the adverse employment decision was made for a discriminatory reason.  See Reeves, 530 U.S. at 148-49; Lathram, 336 F.3d at 1088.  Therefore, the Court finds that defendant is entitled to judgment as a matter of law on the claim of disparate treatment for failure to promote.

### 2.    Other suggested adverse employment actions

It is unclear from plaintiff's complaint and briefs if he is advancing additional claims of disparate treatment based on other actions taken by his supervisor during his employment.  As referenced in his papers, these include confronting plaintiff about the use of e-mail during lunch and break periods, imposing limitations on plaintiff's personal use of BNA's telecommunications and computer equipment, requesting documentation to support plaintiff's use of sick leave, and engaging in what plaintiff describes as "surveillance" of him during the workday.  See, e.g., Pl.'s Mem. at 26-30, 39-43.  Because plaintiff brings this action *pro se*, the Court will assume that he is raising separate disparate-treatment claims with respect to these alleged actions.

Insofar as these claims are independent of the allegations related to the denial of promotion, they fail to satisfy an essential element of a prima facie case of disparate treatment under Title VII.  That is because, even if all factual findings were made in plaintiff's favor, none of the challenged conduct constitutes an actionable adverse employment action.  Plaintiff suffered no legally significant detriment whatsoever as a result of Mr. Rubin's close (and perhaps overbearing) supervision.  He has not even *alleged*, let alone established, that these actions resulted in any loss

of benefits,[11] any reduction of hours of work or salary, or any significant diminishment of work responsibilities -- all of which could be deemed an adverse employment action.  See Baloch v. Norton, 355 F. Supp. 2d 246, 256-57 (D.D.C. 2005) (discussing ways in which a plaintiff could establish an adverse employment action).  Moreover, courts in this Circuit have held that purely psychic injuries such as embarrassment do not qualify as adverse employment actions.  See Brodetski v. Duffey, 141 F. Supp. 2d 35, 47 (D.D.C. 2001) ("Criticism of an employee's performance unaccompanied by a change in position or status does not constitute adverse employment action."); Al-Mahdi v. D.C. Pub. Schs., No. 01-CV-1014, 2005 WL 3272075 at * 5 (D.D.C. Dec. 2, 2005) (humiliation alone does not rise to the level of an adverse employment action) (citing Forkkio v. Powell, 306 F.3d 1127, 1130-1131 (D.C. Cir. 2002)); Childers v. Slater, 44 F. Supp. 2d 8, 20 (D.D.C.1999), vacated in part on other grounds, 197 F.R.D. 185, 191 (D.D.C. 2000) (a reprimand that "amounts to a mere scolding, without any [subsequent] disciplinary action" is not an adverse action); see also Stewart v. Evans, 275 F.3d 1126,1136 (D.C. Cir. 2002) ("This Court has held that formal criticisms or reprimands, without any additional disciplinary action such as a change in grade, salary, or other benefits, do not constitute adverse employment actions.").

Drawing all inferences in favor of plaintiff, the Court concludes that there is no material fact in dispute on this issue and that, as a matter of law, plaintiff did not suffer a tangible adverse

---

[11] The assertion that he "forfeited 58.25 hours of sick leave to BNA" when he resigned in November of 2003 -- for which the only evidence is a pay stub dated December 4, 2003, that reflects a balance of 58.25 hours of accrued sick leave, Pl.'s Ex. L -- cannot constitute a loss of benefits for Title VII purposes because any loss of that time (or its cash equivalent) would be the result of plaintiff's resignation, not any action taken by BNA -- and plaintiff has not alleged that he was constructively discharged.

employment action from any of the conduct by Mr. Rubin described above.  Moreover, even if he

did, none of the incidents contain any racial overtones that might give rise to an inference of

unlawful discrimination; as already noted, plaintiff's own evidence demonstrates that many of his

Caucasian co-workers were subjected to similar treatment.  See Pl.'s Ex. D., Deposition of Scott

Wells, at 9-10, 20-21.  Either way, plaintiff cannot establish a prima facie case of discrimination.

Finally, even if plaintiff could establish a prima facie case, defendant has offered a legitimate

nondiscriminatory reason for Mr. Rubin's actions -- that is, that close scrutiny of plaintiff's

activities was warranted because of his frequent tardiness and unexplained absences -- and

plaintiff has in no way shown that this rationale is a pretext for racial discrimination.

## II.      Hostile Work Environment

Plaintiff separately alleges that the same incidents discussed above, in the aggregate,

created a racially hostile work environment in contravention of Title VII.  This cause of action,

however, likewise cannot survive defendant's motion for summary judgment because plaintiff has

produced no evidence to support a finding that he was subjected to racial hostility.

To establish a prima facie hostile work environment claim based on race, plaintiff must

demonstrate that: (1) he is a member of a protected class; (2) he was subjected to unwelcome

harassment; (3) the harassment occurred because of his race; (4) the harassment affected a term,

condition or privilege of his employment; and (5) the employer knew or should have known of the

harassment, but failed to take any action to prevent it.  See Jones v. Billington, 12 F.Supp. 2d 1,

11 (D.D.C. 1997).  The workplace environment becomes "hostile" for purposes of Title VII only

when the offensive conduct "permeate[s] [the workplace] with discriminatory intimidation,

ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment."  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998); accord Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993); see also Pa. State Police v. Suders, 542 U.S. 129, 133-34 (2004); Holbrook v. Reno, 196 F.3d at 262.

The key terms, then, are "severe," "pervasive," and "abusive," as not just any offensive or discriminatory conduct constitutes an actionable hostile work environment.  Under Faragher v. Boca Raton, 524 U.S. 775, 787-88 (1998), in order to determine whether a work environment is sufficiently hostile to be actionable under Title VII, a court should consider: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or merely offensive; and (4) whether the conduct reasonably interferes with the employee's performance.

> These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code."  Properly applied, this will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."

Id. at 787 (citations omitted).  Moreover, it must be clear that the hostile work environment was the result of discrimination based on a protected status.  As the Second Circuit has explained:

> Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude.  It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002).  Thus "to sustain a hostile work environment claim ... [plaintiff] must produce evidence that she was discriminated against because of her [status]."  Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 440 (2d Cir. 1999); see also Jones v. Billington, 12 F. Supp.2d at 12 (hostile work environment claim failed where plaintiff had "not demonstrated that any of the conduct of which he complains was

related to his race, or that his workplace was permeated with racially discriminatory behavior").

Plaintiff has utterly failed to establish a prima facie hostile work environment claim.  As discussed above, the evidence in this case does not even support an *inference* of racial animosity in the workplace, and certainly it falls far short of showing that "severe," "pervasive," or "abusive" racial harassment permeated plaintiff's work environment at BNA.  Aside from plaintiff's insinuation and speculation, there is nothing in the record that would in any way link the complained-of conduct here to plaintiff's race.  Indeed, as already noted, the undisputed evidence is that the aggressive supervision that plaintiff describes was experienced by African-American and Caucasian editors alike.  Hence, the Court, having considered the totality of the evidence proffered and having drawn all possible inferences in favor of plaintiff, concludes that there are no genuine issues of material fact and that no reasonable jury could find that plaintiff established a hostile work environment claim.

## CONCLUSION

For the foregoing reasons, and upon consideration of the entire record herein, the Court will grant defendant's motion for summary judgment. An order entering judgment for defendant has been issued on this date.

_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge


Dated:   February 28, 2006

Copies to:

Daniel N. Mbulu
12834 Enclave Drive
Orlando, FL  32837
Email: myattorney20042005@yahoo.com

 *Pro se plaintiff*

Deborah J. Israel
Louis J. Rouleau
WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
1401 I Street, NW, 7th Floor
Washington, DC  20005
Email: disrael@wcsr.com
Email: lrouleau@wcsr.com

 *Counsel for defendant*